# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GAIL BEESEN-DWARS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 06 C 5593** |
| v. | ) | |
| | ) | **Hon. Joan H. Lefkow** |
| | ) | |
| DUANE MORRIS LLP, DAVID YELIN, | ) | |
| and JANE L. DALTON, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gail Beesen-Dwars ("plaintiff"), filed a twelve count complaint against defendants Duane Morris LLP ("the Firm"), David Yelin ("Yelin"), and Jane Dalton ("Dalton") (collectively, "defendants"), alleging counts of sex and age discrimination and retaliation against the Firm; one count of intentional interference with contractual relations against Yelin and Dalton; and counts against defendants of harassment, breach of fiduciary duty, intentional interference with prospective economic advantage, breach of a joint defense agreement, breach of a partnership agreement, fraudulent concealment and other fraudulent conduct, intentional infliction of emotional distress, and negligence. Before the court is defendants' motion to dismiss counts V-XII for want of personal jurisdiction and for failure to state a claim under Illinois law and defendants' motion to dismiss counts I-IV for failure to state a timely federal discrimination claim. For the reasons set forth below, defendants' motion is denied in part and granted in part.

## I.     MOTION TO DISMISS STANDARD

A motion to dismiss under 12(b)(6), Fed. R. Civ. P., challenges the legal sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.*; *Sanjuan* v. *American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan* v. *Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed.2 d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, *see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), [FN3] on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz* v. *Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); *Neitzke* v. *Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer* v. *Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

## II.     ALLEGATIONS OF THE COMPLAINT

A.    Background

In February 2000, plaintiff, an experienced commercial real estate attorney, was hired by the law firm Duane Morris as "Special Counsel" with the promise that she would be considered for partnership shortly after the commencement of her employment.  To their word, the Firm offered plaintiff a position as a "Contract Partner" on March 31, 2000, which she accepted.  Plaintiff executed a partnership agreement, and thereafter her compensation was determined by the Partners Board and she was treated as a partner for federal, state, and local tax purposes.  In June 2000, the Firm substantially increased plaintiff's compensation, and then again on March 16, 2001, at which time it promised to consider elevating her to a position as an "Income" or "Equity" partner.

In November 2001, a fellow male partner took a leave of absence to receive treatment for a substance abuse problem.  The Chicago Office Executive Committee of the Firm, which consisted of Yelin and two other partners, asked plaintiff to handle the absent partner's responsibilities.  Plaintiff agreed, and expended extensive time and effort, much of which was non-billable, addressing problems caused by her fellow partner's absence.  Plaintiff was not rewarded for her efforts, but instead suffered a $63,500 pay cut because, according to Yelin, her billable hours had declined.  The absent male partner's pay was not cut.

B.    Perkins's Complaint and Dalton's Flawed Investigation

On October 10, 2002, plaintiff's secretary, Andrea Perkins ("Perkins), emailed the Firm's Human Resources Director to report that plaintiff had made an inappropriate racial remark.  In response to Perkins's email, Dalton, a partner in the Firm's Philadelphia office, undertook an investigation.  Dalton failed, however, to properly investigate Perkins's complaint by failing to

interview key witnesses; failing to conduct in-person interviews with other key witnesses; conducting only a brief and perfunctory interview with plaintiff; discussing her investigation with other Firm partners; and permitting her findings to circulate through the office in violation of the Firm's policy and its representation that the results of Dalton's investigation would remain confidential. In addition to failing to properly investigate Perkins's complaint, Dalton used Perkins's complaint as a pretext for opening a larger inquiry into plaintiff's interactions with other members of the Firm's staff in an effort to find a basis to terminate plaintiff's employment.

Attempting to defend herself against Perkins's complaint and the other allegations made against her in the course of Dalton's investigation, plaintiff requested a copy of Perkins's complaint and a copy of Dalton's investigation report. The Firm, however, refused.

Ultimately, two members of the Firm's Executive Committee, including Yelin, advised plaintiff that though Dalton's investigation had uncovered no evidence that she had made an improper racial remark, it did reveal that she had mistreated Perkins and other staff. Yelin further advised plaintiff that the Firm had notified Perkins by letter that the Firm had found no evidence that plaintiff had made an improper racial remark. Plaintiff then inquired as to whether the letter made any other representations, to which Yelin replied that the letter did not say "much else." That statement, however, was false, because the letter, which Yelin had approved, contained disparaging remarks about plaintiff.

On April 1, 2003, the <u>Chicago Daily Law Bulletin</u> published a front-page article discussing Perkins's allegations against plaintiff. The article reported that "Ms. Beesen-Dwars had engaged in unprofessional conduct," and that "the firm has taken remedial action to assure that such unprofessional conduct will not be repeated." The publication of the article caused

plaintiff tremendous physical and emotional stress. A similar article was published in <u>The Defender</u> on November 8, 2003.

C.      Perkins's Suit Against the Firm and Plaintiff

Soon after the publication of the <u>Chicago Daily Law Bulletin</u> article, in July 2003, Perkins filed suit against the Firm and plaintiff. Plaintiff entered into a joint defense agreement with the Firm, but despite that cooperation, the Firm still refused to provide her with information regarding Dalton's investigation. On January 21, 2004, plaintiff was permitted to briefly look through documents, including Dalton's investigation report, that were scheduled to be produced to Perkins pursuant to a discovery request. During that inspection, plaintiff discovered that Dalton had seriously misquoted her during their interview. Plaintiff was unable, however, to decipher many of the notes, and therefore requested a typewritten copy from the Firm. The Firm again refused to provide plaintiff with a copy.

D.      Defendants' Subsequent Harassment, Discrimination and Retaliation

In September 2003, plaintiff was scheduled to close "one of the most visible and complex affordable housing transactions ever carried out in Illinois." On the eve of the closing, Yelin withdrew plaintiff's paralegal support, claiming that it was needed by other members of the Firm. Plaintiff remained without paralegal support throughout 2004, which forced her to devote a substantial number of hours performing non-billable paralegal work. On another occasion, Yelin fired plaintiff's assistant during a crucial time when plaintiff was rushing to meet a client deadline. Additionally, when Yelin informed plaintiff that he had fired her assistant, he leaned over her in a threatening manner. Yelin also harrassed her by repeatedly reproaching her about

using vacant back office space to prepare for closings and disrupting her work for clients at critical times with persistent demands about non-urgent administrative matters.

Later, in February 2004, Yelin closed one of plaintiff's client's accounts before critical work on the client's account had been completed. As a result, plaintiff was again required to devote a substantial number of hours to non-billable work, this time to clear administrative hurdles to re-open her client's account. Worse, these extra duties prevented plaintiff from timely completing critical work on the client's account. The client became so enraged at how he had been treated by the Firm that he gave his next transaction to a competing firm, despite the fact that he had previously promised it to plaintiff.

In mid-May 2004, plaintiff received an email stating that she needed to meet with the Chicago Office Management Committe on May 24, 2004. At the meeting, which in the interim had been postponed to May 26, 2004, Yelin was hostile, accusatory and verbally abusive, telling plaintiff that she was "non-communicative" and that he could not trust her to work with clients.

On June 3, 2004, plaintiff was in the kitchen of the office suite. Yelin entered and walked quickly towards plaintiff, glaring at her with a menacing expression. Plaintif feared that the much taller Yelin would "crash into her or shove her aside." Plaintiff had to "jump back quickly to avoid being knocked over."

A meeting of the Partners Board was set for June 4, 2004. Prior to the meeting, plaintiff had received various emails suggesting that the Partners Board intended to consider at that meeting whether to terminate her employment. In the weeks following the meeting, plaintiff learned nothing regarding the outcome of the meeting. Finally, on June 22, 2004, plaintiff asked Michael Silverman ("Silverman"), General Counsel of the Firm, whether Yelin had encouraged

the Partners Board to terminate her employment.  Silverman denied that Yelin had approached

the Partners Board about her and insisted that she had not been terminated.

On August 2, 2004, plaintiff again approached Silverman.  This time, plaintiff

complained about Yelin's conduct, which she contended had damaged her practice.  Plaintiff

approached Sliverman with the intent of reaching an amicable solution to her issues with Yelin

and the Firm.  Instead of addressing her concerns, though, Silverman pressured plaintiff to

quickly resolve Perkins's suit and advised her that her issues with the Firm and Yelin would

"take time to resolve."

Having received no response from the Firm regarding her informal complaints, plaintiff

filed a formal written complaint on September 9, 2004 alleging that she had been subjected to

unlawful harassment and discrimination.  Approximately 16 hours later, the Firm sent her a letter

requesting her withdrawal from the Firm by December 31, 2004.  Then, despite her request in

her complaint that any investigation into her allegations be conducted by a mutually acceptable

independent third party, the Firm instead initiated an "internally controlled investigation,

providing no protections to assure impartiality."  Plaintiff objected to the investigation, which

led the Firm to immediately terminate her employment.

## III.  DISCUSSION

A.  Personal Jurisdiction Over Dalton

A federal district court in Illinois has personal jurisdiction over a nonresident defendant

involved in a diversity action only if an Illinois state court would have personal jurisdiction.

*Michael J. Neuman & Associates, Ltd.* v. *Florabelle Flowers, Inc.*, 15 F.3d 721, 724 (7th Cir.

1994) (citing *Dehmlow* v. *Austin Fireworks*, 963 F.2d 941 (7th Cir. 1992)).  Plaintiff bears the

burden of demonstrating the existence of personal jurisdiction, as she is the party asserting jurisdiction. *Publications International, Ltd.* v. *Simon & Schuster, Inc.*, 763 F. Supp. 309, 310 (N.D. Ill. 1991); *Wysnoski* v. *Millet*, 759 F. Supp. 439, 442 (N.D. Ill. 1991) (citing *Saylor* v. *Dyniewski*, 836 F.2d 341, 342 (7th Cir. 1988)).

Dalton argues that she is a non-resident individual whose contacts with Illinois were made solely in the capacity of her employment, and thus, the fiduciary shield doctrine precludes this court from exercising personal jurisdiction over her. As Dalton argues, the fiduciary shield doctrine prevents the exercise of personal jurisdiction over an individual whose activities in Illinois were performed solely on behalf of her employer, corporation, or other principal. *Rice* v. *Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994) (citations omitted); *Kula* v. *J.K. Schofield & Co., Inc.*, 668 F. Supp. 1126, 1129 (N.D. Ill. 1987) (citations omitted). A defendant's ability to assert the fiduciary shield as a defense is not without limitation, however:

> First, the fiduciary shield doctrine is discretionary or equitable, rather than an absolute entitlement, and should be applied only where equity demands it. Second, the doctrine will be removed if the defendant was acting also, or instead, to serve his own personal interests. Third, the discretion exercised by the individual is a factor that a court should consider when determining whether the fiduciary shield doctrine applies to a case.

*Interlease Aviation Investors II (Aloha), L.L.C.* v. *Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 912 (N.D. Ill. 2003) (collecting cases; internal quotation marks and citations omitted); *accord, e.g.*, *Rice*, 38 F.3d at 912 (discussing the equitable and "personal interest" limitations on the doctrine).

Relying on *Vandeveld* v. *Christoph*, 877 F. Supp. 1160 (N.D. Ill. 1995), plaintiff argues that Dalton, as an equity partner in the Firm, possessed a sufficient ownership interest in the Firm to preclude her assertion of the fiduciary shield defense. The *Vandeveld* court found that

"the [fiduciary shield] doctrine does not protect general partners, who, unlike corporate officials, are both agents and principals of the partnership." 877 F. Supp. at 1164. Dalton responds that *Vandeveld* is distinguishable because in that case the complaint expressly alleged that in consummating the partnership agreement at issue the non-resident defendant asserting the fiduciary shield defense was acting on behalf of a partnership composed of the defendant and one other individual.

Dalton's distinction is unpersuasive. *Vandeveld* relies on *Felicia Ltd.* v. *Gulf American Barge Ltd.*, 555 F. Supp. 801, 806 (N.D. Ill. 1983), which observed that "general partners are both agents and principals. As principals they do not represent the partnership, they are the partnership." On that basis, *Felicia* held that jurisdiction over a partnership or any partner-defendant establishes jurisdiction over all other partner-defendants. That rule has been consistently applied by other courts without equivocation and without regard to the size of the partnership. *See Brown* v. *1995 Tenet ParaAmerica Bicycle Challenge*, 931 F. Supp. 592, 594 (N.D. Ill. 1996); *Wolfson* v. *S & S Securities*, 756 F. Supp. 374, 377 (N.D. Ill. 1991); *Miller* v. *McMann*, 89 F. Supp. 2d 564, 568 (D.N.J. 2000); b*ut see Guy* v. *Layman*, 932 F. Supp. 180, 182 (E.D. Ky. 1996). In light of the above cited cases, since this court's jurisdiction over the Firm is not in dispute, Dalton is not entitled to the protections of the fiduciary shield doctrine and is subject to personal jurisdiction in this court.

B.      Federal Discrimination Claims

Defendants argue that counts I through IV of plaintiff's complaint, which allege the Firm violated Title VI, 42 U.S.C. § 2000e-5(e)(1), and the ADEA, 29 U.S.C. § 626(d), should be

dismissed because plaintiff failed to timely file a charge of discrimination with the Equal Employment Opportunity Commission ("the EEOC").

Under Title VII and the ADEA, plaintiff was required to file her charge of discrimination within 300 days "after the alleged unlawful employment practice occurred." *Hardin* v. *S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999) ("Under Title VII, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely charge....").

An unlawful employment practice may be either a discrete discriminatory or retaliatory act or a hostile work environment claim. *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 110, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). A "discrete retaliatory or discriminatory act 'occurred' on the day that it "happened." *Id.* at 110. Discrete discriminatory acts, such as termination, failure to promote, denial of transfer, or refusal to hire, are "not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113-14. Hostile work environment claims, however, are different. Title VII does not preclude consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, so long as any act contributing to that hostile environment takes place within the statutory time period. *Id.* at 117.

1.      Prelimitations Period, Discrete Discriminatory Acts

In her response to defendants' motion, plaintiff concedes that claims alleging discrete acts of discrimination occurring before March 23, 2004 are time-barred.[1]

---

[1]Without citation to authority, plaintiff asserts that the 300-day limitations period extends back 301 days in this case because on January 17, 2005, the day before she filed her EEOC charge, the EEOC office was closed due to a federal holiday. In its reply, defendant does not take issue with plaintiff's calculation. Nevertheless, it is unnecessary at this time to decide whether the limitations period expired on March 23, 2004 or March 24, 2004, as the parties do not identify an allegedly discriminatory act that

(continued...)

2.      Postlimitations Period, Discrete Discriminatory Acts

Plaintiff effectively alleges three types of postlimitations period, discrete discriminatory acts: 1) failure to promote; 2) unequal pay; and 3) retaliation.

a.      Failure to Promote

Plaintiff claims that the Firm failed to promote her because of her sex, in violation of Title VII, and age, in violation of the ADEA, respectively.  Plaintiff first contends that because the number of partners at the Firm was not fixed, the Firm had the opportunity to promote her "each and every day until [she] was terminated."  Defendants respond that plaintiff's claim fails because, though it could have promoted her, there is no evidence or allegation that it ever actually considered her for and denied her a promotion to equity partner during the limitations period.[2]

To begin, it is important to recognize that plaintiff's claim does not involve the typical situation in which several employees, including the plaintiff, vie for a single available

_____

[1](...continued)
took place on either date and the issue presently before court is simply whether alleged discriminatory acts that occurred outside the statutory time period for filing EEOC charges are actionable under Title VII or the ADEA.  That issue can be resolved without defining to the day the applicable limitations period.  Accordingly, the court defers consideration of whether the 300-day period for filing EEOC charges excludes federal holidays.  For present purposes, then, the court accepts the parties' date for the end of the limitations period: March 23, 2004.

[2]In a separate argument, defendants contend that plaintiff alleges that the Firm's failure to promote her during the limitations period constituted a continuing violation that began prior to the start of the limitations period and continued each day she remained employed by the Firm.  Defendants attempt to characterize plaintiff's argument as alleging a "continuing violation" because the Supreme Court has specifically identified a "failure to promote" as a "discrete act" and as such, reliance on the "continuing violation" doctrine would be unavailing.  *See Hildebrandt* v. *Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1028 (7th Cir. 2003).  At no point in her response to defendants' motion, however, does plaintiff invoke the continuing violation doctrine.  Instead, plaintiff makes clear that she alleges that the failure to promote her during the limitations period was a fresh, independent act of discrimination that occurred every day from the start of the limitations period up to and including the date of her termination.

promotion. As such, plaintiff cannot point to a position vacancy announcement or formal application process to pinpoint when a promotion decision was made. Further complicating matters, it is unclear whether the Firm had a policy or practice of considering partnership promotions on certain dates or whether it maintained or adhered to a formal process for making partnership promotion decisions. As a consequence, it is impossible at this stage of the proceedings for plaintiff to specifically identify and for the court to determine the date on which the alleged promotion decision was made.[3]

Considering plaintiff's complaint in its entirety, though, it is clear that she alleges that during the limitations period she was qualified for a promotion, a position was available, and she had been promised that she would be considered for equity partnership. Together, these allegations constitute a claim that she was considered for and denied a promotion at some point during the limitations period. Defendants may disprove that allegation on summary judgment or at trial, but at this stage of the litigation it is sufficient to defeat defendants' motion to dismiss.[4]

_____

[3]The difficulty of isolating when the Firm decided not to promote plaintiff is best illustrated by defendants' own inability to clearly state when it made its prelimitations period decision not to promote her to equity partner. Defendants do not identify a specific date, decision-maker, or basis for the Firm's decision. Instead, defendants simply state that it is clear that it made a decision to deny plaintiff a promotion prior to the start of the limitations period because plaintiff alleges that she was advised before March 23, 2004 to seek alternate employment. Defendants thus employ the very same reasoning used by plaintiff to support her claim that she was considered for and denied a promotion after the start of the limitations period: the Firm necessarily decided not to promote her when it decided to terminate her employment.

[4]To clarify, the court agrees with defendants that the mere fact that plaintiff could have been promoted during the limitations period is insufficient to sustain her failure to promote claim. The relevant inquiry is whether defendants discriminated against plaintiff by denying her a promotion. If defendants did not consider her for a promotion, and its failure to do so was not itself an act of discrimination, then plaintiff's claim fails. Otherwise, as defendants point out, a failure to promote claim could never be time-barred, because an employer could conceivably always promote an employee in the 300 days before an EEOC charge is filed. It appears, however, that plaintiff alleges that she was considered for promotion during the limitations period, which is enough at this time to make her claim timely.

Regardless, plaintiff's allegation that the Firm denied her a promotion at the same time it terminated her employment is an independent basis to sustain her failure to promote claim. Defendant argues that a discriminatory discharge claim cannot be the basis for a failure to promote claim because that would effectively negate the statute of limitations, as a termination would always give rise to a failure to promote claim. While that may true, the fact that a discharged employee loses an opportunity for promotion when she loses her employment imposes on her a separate and independent cost, which entitles her to seek separate redress.[5] *See Harsley* v. *United Parcel Service of America, Inc.*, 2004 WL 1629590 (S.D. Ind. Feb. 25, 2004).

      b.     Unequal Pay

Plaintiff concedes that all claims for discriminatory pay received prior to March 23, 2004 are time-barred. Defendant, in turn, concedes that plaintiff may assert a claim and recover damages based upon the Firm's continuing issuance of paychecks to her during the 300 day filing period that reflected the alleged discriminatory paycuts to which it allegedly subjected her prior to the start of the limitations period.

      c.     Retaliation

---

[5]Defendants acknowledge as much when they argue that plaintiff's allegation that she was advised to seek alternative employment in March 2003 demonstrates that she was aware at that time that she had been denied a promotion. In making that argument, defendants concede that the finding that an employee is not suitable for employment necessarily involves a determination that she is also not suitable for promotion. It is possible that defendants may have meant to suggest that the fact that plaintiff had been told to seek alternative employment is proof that it would not have then reconsidered whether to promote her to equity partner. In short, defendants may contend that it had a policy that an employee had one and only one opportunity for promotion to equity partner. Such an argument may ultimately prevail, but at the motion to dismiss stage, plaintiff's employment by the Firm for two years after its alleged recommendation that she look for alternate employment gives rise to an inference that plaintiff's prospects with the Firm remained open, even if only slightly. As a consequence, this argument also fails to defeat plaintiff's claim.

Plaintiff concedes that all claims for retaliation based on events that occurred prior to March 23, 2004 are time-barred. Defendant, in turn, concedes that plaintiff may assert a claim for retaliation based on the Firm's alleged termination of plaintiff's employment in September 2004 in response to her letter to the Firm detailing the discrimination to which it had allegedly subjected her.

3.      Hostile Work Environment

Defendants do not dispute that the court may consider conduct alleged outside the statutory time period that contributed to the allegedly hostile work environment endured by plaintiff during the statutory time period" for purposes of assessing liability on plaintiff's hostile work environment claim. *Nat'l Passenger R.R.* v. *Morgan*, 536 U.S. 101, 105, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Defendants argue, however, that plaintiff's allegation that the Firm conducted a discriminatory investigation into Perkins's complaint is not actionable as part of plaintiff's hostile work environment claim because it is a discrete, discriminatory act.

As defendants correctly argue, their position is supported by *Owens-Floyd* v. *City of Chicago*, 2006 WL 2355573, at *3 (N.D. Ill. Aug. 11, 2006), which found that an employer's alleged discriminatory initiation of disciplinary proceedings was a discrete, discriminatory act that was not actionable because it occurred outside the limitations period. Further support is found in cases outside the Seventh Circuit. *See Henderson* v. *New York*, 423 F. Supp. 2d 129 (S.D.N.Y. 2006) (correction officer's claims based on supervisor's alleged discriminatory investigation and referral of inmate grievances to the Inspector General's Office were time-barred discrete acts that could not be saved by the continuing violation doctrine); *Mora* v. *Ashcroft*, 142 Fed. Appx. 206 (5th Cir. 2005) (Justice Department's alleged discriminatory

investigation into former federal employee's alleged improper use of a government vehicle constituted a discrete, discriminatory act); *Garden* v. *Hawley*, 104 Fed. Appx. 2 (9th Cir. 2004) (claims based on alleged discriminatory investigation which resulted in officer's demotion from lieutenant to patrol deputy were time-barred and could not be saved by the continuing violation doctrine because they constituted independently actionable discrete, discriminatory acts).

Plaintiff alleges that the alleged discriminatory investigation had a direct, negative impact on the terms and conditions of her employment. Had defendants conducted the investigation properly, plaintiff contends that she would have been absolved of any alleged misconduct, thereby removing the taint from her employment record that ultimately contributed to her termination. The alleged discriminatory investigation is, then, analogous to more traditional discrete acts, such as a failure to promote or pay cut, because it gave rise to an injury on its own. As such, any claim based on conduct relating to the alleged discriminatory investigation accrued at the time plaintiff knew, or should have known, that it caused her injury. Whenever that was, it was before the start of the limitations period. Therefore, the acts comprising the alleged discriminatory investigation are not independently actionable and cannot be used to support plaintiff's hostile work environment claim.

C.      State Law Claims

1.      Breach of Fiduciary Duty Claim

Defendants argue that plaintiff's breach of fiduciary duty claim must be dismissed because they owed no such duty to plaintiff. Plaintiff responds that as a "contract partner", she was required to execute the Firm's partnership agreement, which is governed in certain circumstances by Delaware law. Since Delaware law permits a person to be admitted to a partnership without making a contribution to the partnership or acquiring an economic interest in the partnership, she contends that the her status as a "contract partner" is sufficient to establish that the Firm owed her a fiduciary duty.

Courts universally recognize that partners exist in a fiduciary relationship and impose on them obligations of the utmost good faith and integrity in their dealings with one another in partnership affairs. *See Couri* v. *Couri*, 447 N.E.2d 334 , 95 Ill. 2d 91, 69 Ill. Dec. 117 (Ill. 1983); Laura Hunter Dietz *et al.*, 59A Am. Jur. 2d Partnership § 280 (collecting cases). Thus, if plaintiff qualifies as a "partner", then the Firm owed her a fiduciary duty.

The Firm's partnership agreement does not specify whether "contract partners" qualify as "partners" for purpose of determining the nature and scope of the duties and obligations owed between "contract partners" and "equity partners". The only distinction the partnership agreement makes between "partners" is in the manner in which each partners' compensation is determined: "The Partners Board from time to time shall....determine on an individual basis (I) the manner in which each partner will be compensated, which may be...formula-based or other compensation by contract mutually agreed to by the partner and the Partners Board ("Contract Compensation") or by percentage of the firm's profits (a "Percentage Interest") and the amount and timing of each partner's compensation." *See* Pl's Compl., Ex. D, ¶ 9(b). While profit splitting is a typical indicium of partnership, there is nothing in the partnership agreement to

suggest that those whose compensation is not determined by a Percentage Interest are excluded from the partnership.  In fact, if anything, the fact that "contract partners" are required to execute the partnership agreement and are thereby subject to its terms and conditions suggests that they too are "partners" for purposes of partnership law.

In any event, since the partnership agreement is effectively silent on the scope of the Firm's partnership for purposes of partnership law, the court must look to the Delaware Revised Uniform Partnership Act ("the Act"), as the partnership agreement provides that the provisions of the Act shall apply to the extent it addresses a matter not otherwise addressed by the partnership agreement.  *See* Pl's Compl., Ex. D, ¶ 23.  The Act, § 15-205 provides that "[e]ach person to be admitted as a partner to a partnership formed under either § 15-202(a)(i) or § 15-202(a)(ii) of this title may be admitted as a partner without acquiring an economic interest in the partnership."  Since, then, neither the partnership agreement nor the Act excludes "contract partners" from the partnership, there is no basis to find as a matter of law that the Firm did not owe plaintiff a fiduciary relationship.  The requirement that she execute the partnership agreement and her alleged treatment as a "partner" for purposes of state and federal income taxes is sufficient to create an inference that she was a "partner" for purposes of partnership law and therefore owed a fiduciary duty by the Firm.

2.      Interference With a Prospective Economic Advantage With a Third Party Claim

The parties agree that defendants cannot be liable for interference with prospective economic advantage unless it took some wrongful action, directed at a third party, to induce the third party not to do business with plaintiff.  Defendants contend that plaintiff's complaint must be dismissed because it fails to allege action directed at a third party.

17

Plaintiff points to two paragraphs in her complaint that she contends allege that Yelin took specific actions directed at plaintiff's clients:

> Paragraph 54 - In February, 2004, Plaintiff discovered that one of her active client accounts had been closed by Defendant Yelin, when critical, sensitive work remained to be done. Defendants imposed one administrative hurdle afer another before the account could be reopened. Ms. Beesen-Dwars was required to expend a great deal of non-billable time and effort to resolve the problem. This prevented Ms. Beesen-Dwars from timely completing legal work for her client.

> Paragraph 55 - The client promised Ms. Beesen-Dwars his next large transaction. The client was so enraged at how he had been treated by the Firm, that he gave his deal (which was to have been Plaintiffs) to her competitors along with approximately $250,000 in legal fees that Plaintiff would have received in 2004.

Together, these paragraphs allege that defendants' conduct substantially impaired her ability to complete critical, time-sensitive work on behalf of her client. That is a cost not borne by plaintiff alone; indeed, her client's desire to complete an important transaction was frustrated by defendants' alleged conduct. Cases where claims of interference with a prospective economic advantage have been dismissed for failure to allege action directed at a third party involve situations where a third party is not directly harmed by the alleged interferer's conduct. *See, e.g., Mercury Skyline Yacht Charters* v. *Dave Matthews Band, Inc.*, 2005 WL 3159680, at *9 (N.D. Ill. Nov. 22, 2005); *Premier Transport, Ltd.* v. *Nextel Comm'ns, Inc.*, 2002 WL 31507167, at *2 (N.D. Ill. Nov. 12, 2002). In this case, plaintiff's client was directly harmed by defendants' conduct, which is evidenced by plaintiff's allegation that her client was "enraged at how he had been treated by the Firm."

Defendants' argument rests on the assumption that absent evidence that the alleged interferer directly communicated with a third party, a plaintiff cannot maintain a claim for interference with a prospective economic advantage. Defendants, however, cite no authority to

support that proposition, and the court can see no reason why a plaintiff should be able to bring a claim when an interferer says something negative about her to a third party but not when the interferer does something that allows the third party to draw its own negative conclusion. The direct and reasonably foreseeable harm suffered by plaintiff's client as a result of defendants' conduct is sufficient to establish that defendants directed their conduct towards plaintiff's client.

3.      Intentional Interference With Contract Claim

In Count VII, plaintiff alleges that Dalton and Yelin intentionally induced the Firm to breach the partnership agreement entered into between plaintiff and the Firm. Defendants contend, however, that they cannot be held liable for interference with a contract to which they themselves are parties. Plaintiff acknowledges the general rule cited by defendants that a party cannot tortiously interfere with its own contract, *see F.E.L. Publications, Ltd.* v. *Catholic Bishop of Chicago*, 754 F.2d 216, 221 (7th Cir. 1985), but contends that this case is distinguishable because her "legal relationship extended not merely to Defendants Dalton and Yelin, or Duane Morris, LLP, but also to each individual partner who was a signatory to the partnership agreement," and therefore defendants interfered with a contract other than their own.

This argument was rejected in *Home Savings of Am.* v. *The Inland Group, Inc.*, 1991 WL 270423 (N.D. Ill. Dec. 5, 1991), which found that since a party cannot tortiously interfere with its own contract, a general partner cannot be liable for tortious interference with a contract of the partnership. *Id.* at * 6  (citing *Battista* v. *Lebanon Trotting Ass'n*, 538 F.2d 111, 116-117 (6th Cir. 1976). As explained in *Battista*, this rule is based on the fact that  "[a] corporation is generally recognized as a separate legal entity from its shareholders, officers and directors, but a partnership is not so considered." 538 F.2d at 117. Partnerships do not have a separate legal

existence from the partners who form the partnership. *Life Care Centers of Am., Inc.* v. *Charles Town Associates Ltd. P'ship*, 79 F.3d 496, 502-503 (6th Cir. 1996). *Home Savings* is persuasive, and thus, plaintiff's attempt to maintain a claim against Dalton and Yelin based on a contract to which they as partners in the partnership are party is unavailing.

Plaintiff argues that the general rule that a party cannot be liable in tort for interfering with its own contract does not apply where the defendant acts for the purpose of harming the plaintiff or acts in a manner not in the best interest of the firm. Plaintiff's only support for this contention is *Cress* v. *Recreation Servs., Inc.*, 795 N.E.2d 817, 844, 341 Ill. App. 3d 149, 277 Ill. Dec. 149 (Ill. App. Ct. 2003). *Cress* is distinguishable, however, because that case involves the scope of the qualified privilege enjoyed by a third party, such as an architect, engineer or corporate officer, to purposely bring about a breach of plaintiff's contract with another. The law regards those third parties differently, as they are acting to protect a conflicting interest that is considered under the law to be of a value equal to or greater than the plaintiff's contractual rights. Accordingly, a plaintiff can state a cause of action for tortious interference with a contract against such a third party only where he induces a breach of contract, not to further his principal's best interest, but with the intent to harm the other party to his principal's contract or to further his personal goals. Under those circumstances the superior, conflicting interest is not being served, and thus the third party is not entitled to the protection of the qualified privilege. In this case, plaintiff's claim is not against a third party who was not a party to the contract, but instead it is against the contracting party itself. Thus, plaintiff's reliance on *Cress* is unavailing.


4.      Breach of Multiple Representation Agreement Claim

In Count VIII, plaintiff alleges that defendants breached the multiple representation agreement (the "MRA") the Firm and plaintiff entered into with Miller Shakman & Hamilton ("MSH") for MSH's joint representation of them in the racial harassment lawsuit initiated by Perkins.  Specifically, plaintiff alleges that defendants breached the MRA by withholding documents from her, including Dalton's report and notes regarding her investigation of Perkins's complaint, and by "manipulating, controlling, and directing [plaintiff's] defense in the Perkins' litigation."   Plaintiff argues that these actions breached the Firm's promise in the MRA that it would not direct or regulate MSH's representation of her.  Defendants contend that plaintiff cannot state a claim for breach of the MRA because the contractual obligation to not direct or control MSH's representation of plaintiff was a promise made by the Firm to MSH, not to plaintiff.

As an initial matter, to be clear, plaintiff does not allege a breach of a joint defense agreement.  "Joint defense groups are arrangements in which co-defendants who are represented by separate lawyers agree to cooperate with each other in formulating their legal position...The joint defense arrangement is distinguishable from the situation of multiple representation, where a single attorney represents multiple clients in a common matter. "  Deborah S. Bartel, Reconceptualizing the Joint Defense Doctrine, 65 Fordham L. Rev. 871 (1996).  The distinction is important because a joint defense agreement is executed between two parties and governs the terms of their duties and obligations to one another.  Under those circumstances, clearly either party can bring suit against the other to enforce the terms of that agreement.  Multiple representation agreements, however, involve at least three parties: the co-defendants and the single attorney.  Unlike a joint defense agreement, each of the defendants executes a multiple

representation agreement with a single attorney.  As such, generally, the contractual obligations, at least for the most part, do not run directly between the defendants but instead between the defendants and the attorney.

In this case, though, plaintiff alleges that the Firm made enforceable promises to her in the MRA.  Neither party cites a case addressing whether an employee, who along with her employer executes an agreement with an attorney for that attorney's representation of them in a common matter, can maintain a cause of action against her employer for a breach of the terms of the multiple representation agreement.  Defendants, though, appear to concede that she may, as they seem to acknowledge that the Firm made an enforceable promise to pay plaintiff's defense costs whether she remained represented by MSH or retained separate counsel.  Plaintiff does not allege that the Firm breached the MRA by failing to pay her defense costs, but the fact that defendants concede that she could bring an action if they had, means that the court need only determine what promises were made and whether plaintiff has sufficiently alleged their breach, not whether promises between co-defendants participating in a multiple representation agreement are enforceable by either party.[6]

The provision of the MRA plaintiff contends defendants breached states that the Firm "will not direct or regulate our exercise of professional judgment in rendering legal services to Ms. Beesen-Dwars."  Clearly, in the first instance this promise is one made by the Firm to MSH.

---

[6]For the sake of completeness, though, if defendants contest whether such promises are enforceable by participants to a MRA, the court finds its position unpersuasive.  If such promises were held unenforceable, co-defendants would be forced to execute a separate agreement between themselves outlining their rights and obligations vis-à-vis one another and the MRA.  That would only impose costs on the parties without promoting any greater clarity in defining the terms and conditions of the parties' participation in a MRA.  Accordingly, a participant to a MRA may bring a breach of contract action against a fellow participant to enforce promises therein between participants.

Nevertheless, it is of such importance and value to plaintiff, as it ensures that the Firm - the party paying for MSH's fees and expenses - will not override plaintiff's instructions to MSH regarding her representation, that it must also be considered a promise made directly to her.

Consider, for instance, a MRA entered in to between an insurer and a policyholder. That MRA is almost sure to include a provision granting the insurer the right to direct the representation. That right is the consideration the insurer receives for its participation in the multiple representation, just as the policyholder's right to have her defense costs paid for by the insurer is typically hers. Even though the insurer's right is stated in terms directed at the attorney, it is of little consequence to the attorney, as the attorney has little interest in which of the multiple parties he represents will direct his representation. In contrast, the question of who has the power to direct the representation is of vital importance to the participating parties, and thus, it is properly considered as an agreement between them.

Thus, in this case, the MRA contains a promise by the Firm to MSH and to plaintiff that the Firm would not control or direct MSH's representation of plaintiff. Since plaintiff alleges that the Firm did just that, her claim survives defendants' motion to dismiss.[7]

5.      Breach of the Partnership Agreement Claim

In Count IX, plaintiff alleges that defendants breached an implied covenant of good faith and fair dealing by engaging in conduct that violates public policy and acted in bad faith in creating false grounds for terminating her employment. Defendants contend that the partnership agreement is governed by Illinois law and that that state does not recognize a cause of action for

---

[7]Plaintiff does not dispute that neither Dalton nor Yelin were parties to the MRA. Accordingly, plaintiff cannot assert a claim against them individually for a breach of that agreement. Plaintiff's Count IX is, therefore, dismissed as to Dalton and Yelin.

breach of the implied covenant of good faith and fair dealing, citing *Central States, Southeast & Southwest Areas Pension Fund* v. *Wintz Parcel Drivers, Inc.*, 1990 WL 19913, at *2 (N.D. Ill. Feb. 21, 1990).

Plaintiff again points to paragraph 23 of the partnership agreement to support her contention that the court should look to Delaware law to determine whether she can maintain a cause of action for breach of the implied covenant of good faith and fair dealing. That provision, though, does not allow for the application of Delaware law in every instance. Instead, it merely provides that the Delaware partnership act applies in the event it addresses a matter not otherwise addressed by the partnership agreement. Plaintiff points to no provision of that act specifying whether an implied covenant of good faith and fair dealing is included in partnership agreements. Accordingly, there is no basis to apply Delaware law in this instance.

Since a court sitting in diversity applies the substantive law of the forum state, *see Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), Illinois law governs. Under Illinois law, an implied covenant of good faith and fair dealing is a rule of construction, not a stand-alone obligation. *In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006) (citing *L.A.P.D., Inc.* v. *General Electric Corp.*, 132 F.3d 402 (7th Cir. 1997) (Illinois law); *Continental Bank, N.A.* v. *Everett*, 964 F.2d 701 (7th Cir. 1992) (Illinois law); *Northern Trust Co.* v. *VIII South Michigan Associates*, 657 N.E.2d 1095, 1104, 276 Ill. App. 3d 355, 367, 212 Ill. Dec. 750 (Ill. App. Ct. 1995)). The duty of "good faith" in contract law is "a gap-filling approach designed for an issue that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *L.A.P.D., Inc.*, 132 F.3d at 404 (citations and quotations omitted).

Plaintiff does not identify a provision of the partnership agreement that is subject to interpretation. Instead, she asks the court, in effect, to read into the partnership agreement a provision that her employment may only be terminated for cause. In *Industrial Representatives, Inc.* v. *CP Clare Corp.*, 74 F.3d 128 (7th Cir. 1996), and *Digital Equipment Corp.* v. *Uniq Digital Technologies, Inc.*, 73 F.3d 756, 758-59 (7th Cir. 1996), however, the Seventh Circuit held that if an employment contract permits discharge without cause, "use of that power is not contingent on satisfying a court that the decision was an exercise of 'good faith and fair dealing.'" Accordingly, since the partnership agreement did not constrain the Firm's ability to terminate her employment, defendants cannot be held liable even if the Firm discharged her for illegitimate reasons. *Kumpf* v. *Steinhaus*, 779 F.2d 1323, 1326 (7th Cir. 1985) (stating, in a case decided under a similar Wisconsin law, "[a] contract at will may be terminated for any reason (including bad faith) or no reason, without judicial review....").

An exception to this well-recognized rule, though, is "a termination that violates a fundamental and well-defined public policy as evidenced by existing law." *Id.* Neither party cites and the court was unable to find a case addressing whether Illinois recognizes a common law exception to the at-will doctrine premised on alleged violations of federal and state anti-discrimination statutes. Other states, however, do not permit a plaintiff to restate statutory discrimination claims as implied common law contract claims. *See Finch* v. *Hercules, Inc.*, 809 F. Supp. 309, 312 (D. Del. 1992) (finding that Delaware law does not permit an implied covenant claim premised on alleged age discrimination); *Blum* v. *Witco Chem. Corp.*, 829 F.2d 367, 377 (3rd Cir. 1987) (holding the same under the covenant in New Jersey with regard to age discrimination); *Bruffett* v. *Warner Comm., Inc.*, 692 F.2d 910, 920 (3rd Cir. 1982) (holding the

same under the covenant in Pennsylvania with regard to discrimination on the basis of disability). These cases reason that since there exist elaborate statutory schemes at both the federal and state levels that address the public policy concern of race, sex and age discrimination and which create a statutory remedy in derogation of the common law employment-at-will doctrine, complainants should be limited to the relief provided for them expressly by the statutes. This court predicts that the Illinois Supreme Court would find this reasoning persuasive and follow other states in rejecting discrimination claims repackaged as common law claims. Accordingly, plaintiff's claim is dismissed.[8]

6.      Negligent Investigation of Perkins's Complaint Claim

In Count X, plaintiff alleges that defendants negligently conducted their investigation into Perkins's complaint of racial harassment. Defendants argue that plaintiff's negligence claim is barred by the economic-loss doctrine, often called the *Moorman* doctrine, which prevents

_____

[8]To emphasize, even if Delaware law applies, plaintiff's claim still fails, as Delaware courts have consistently rejected common law claims premised on discrimination prohibited by state and federal anti-discrimination statutes. *See Holland* v. *Zarif*, 794 A.2d 1254, 1258 (Del. Ch. 2002) (citing *Ayres* v. *Jacobs & Crumplar*, 1996 WL 769331 (Del. Super. Dec. 31, 1996) (breach of covenant of good faith and fair dealing claim based on race and sex discrimination brought by an at-will employee did not state a cognizable claim; rather, plaintiff was required to rely on applicable statutory remedies); *Drainer* v. *O'Donnell*, 1995 WL 338700, at *2 (Del. Super. May 30, 1995, rev. July 28, 1995) (holding no common law cause of action for sexual harassment under Delaware law; employee's only state law recourse was under the Delaware Discrmination Act); *Williams* v. *Caruso*, 966 F. Supp. 287, 292 (D. Del. 1997) (plaintiff could not invoke public policy exception to at-will employment doctrine to press claim that she was discharged in retaliation for making a sexual harassment charge; because retaliatory discharge was already covered by 19 Del. C. § 726, the court predicted that the Delaware Supreme Court would not recognize an overlapping common-law cause of action for retaliatory discharge); *Finch* v. *Hercules Inc.*, 809 F. Supp. 309, 312 (D. Del. 1992) (predicting that the Delaware Supreme Court would not recognize a common law cause of action for breach of the implied covenant of good faith and fair dealing for a claim that an employee was discharged on the basis of his age, because Delaware case law had made only "careful incursions ... upon the employment[-]at-will doctrine" and that the Delaware Supreme Court would not incur further "where there is in place an elaborate statutory scheme addressing the same public policy concerns")). Accordingly, Delaware law also requires the dismissal of plaintiff's implied covenant of good faith and fair dealing claim.

recovery for most tort claims when the damages are purely economic. Plaintiff responds that the *Moorman* doctrine does not apply in this case because she alleges defendants breached their fiduciary duty, which she regards as an extra-contractual duty. In reply, defendants contend that since the source of their alleged fiduciary duty is the partnership agreement, the alleged fiduciary duty is not extra-contractual and thus the "extra-contractual" exception to the *Moorman* doctrine does not apply.

Defendants' argument was rejected in *In re Edgewater Med. Ctr.*, 344 B.R. 864, 871 (N.D. Ill. 2006). There, the court found that where a fiduciary relationship arises as a result of a contract, Illinois law permits damages calculated based on a breach of that fiduciary duty, not just those based on a breach of the contract giving rise to that duty. *Id.* (citing *Seerveld* v. *Gerstenberg & Co.*, 1986 WL 2609, at *2 (N.D. Ill. Feb. 21, 1986)). In *Cement-Lock* v. *Gas Tech. Inst.*, 2005 WL 2420374 (N.D. Ill. Sept. 30, 2005), the court similarly extended the exception to the economic loss doctrine to cases where the plaintiff has alleged that the defendants owed an extra-contractual fiduciary duty to the plaintiffs. *Id.* (citing *Ploog* v. *HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 875 (N.D. Ill. 2002) (economic loss doctrine does not bar negligence claim against mortgagor, where mortgagor owed fiduciary duty to mortgagee); *Choi* v. *Chase Manhattan Mortg. Co.*, 63 F. Supp. 2d 874, 883 (N.D. Ill. 1999) (same)). This court follows these decisions in finding that the economic loss doctrine does not bar negligence claims premised on a breach of a fiduciary duty that arose out of a contract.

7.    Intentional Infliction of Emotional Distress Claim

In Count XI, plaintiff alleges that defendants committed the tort of intentional infliction of emotional distress by 1) approaching her in a manner causing an apprehension of imminent

physical harm; 2) screaming at and demeaning her in front of fellow partners and others at the Firm; 3) threatening her employment; 4) undermining her performance, her standing within the Firm and her client relationships; and 5) pressuring her to inappropriately bill clients. Defendants do not dispute that plaintiff alleges an assault by defendants, nor that an alleged assault may satisfy the extreme and outrageous requirement for an intentional infliction of emotional distress claim. Defendants argue, only, that the assault and other misconduct alleged in this case do not constitute "extreme and outrageous" conduct.

In order to state a cause of action for intentional infliction of emotional distress under Illinois law, a plaintiff must allege that "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; [and] (3) the defendant's conduct in fact caused severe emotional distress." *Doe* v. *Calumet City*, 641 N.E.2d 498, 506, 161 Ill. 2d 374, 204 Ill. Dec. 274 (Ill. 1994). Conduct may be characterized as extreme and outrageous where (1) the character of the conduct itself is extreme and outrageous; (2) the conduct arises out of an abuse of a position or relationship in which the defendant has authority over the plaintiff; or (3) the defendant knew of some peculiar susceptibility of the plaintiff to emotional distress. *Calumet City*, 641 N.E.2d at 506-7 (citing *Rudis* v. *Nat'l College of Educ.*, 548 N.E.2d 474, 476, 191 Ill. App. 3d 1009, 139 Ill. Dec. 89 (1989)).

Applying these standards and viewing all allegations in the light most favorable to plaintiff, she has stated a colorable claim for intentional infliction of emotional distress under federal notice pleading standards. As noted above, plaintiff claims that she was subjected over

many months to sexist and sometimes physically threatening abuse from her superiors, which caused her severe emotional distress and to fear for her safety and employment. These allegations go well beyond "[m]ere insults, indignities, threats, annoyances, petty oppressions or trivialities", which are not actionable as intentional infliction of emotional distress. *Oates* v. *Discovery Zone*, 116 F.3d 1161, 1174 (7th Cir. 1997) (quoting *McGrath* v. *Fahey*, 533 N.E.2d 806, 809, 126 Ill. 2d 78, 127 Ill. Dec. 724 (Ill. 1988)). The threat of physical harm, coupled with the duration of the offensive conduct and defendants' supervisory power, is sufficient to permit a trier of fact to conclude that defendants' conduct was extreme and outrageous.[9] *See James F. Jackson* v. *Local 705, Intern. Broth. of Teamsters, AFL-CIO*, 2002 WL 460841, *15-16 (N.D. Ill. Mar. 26, 2002) (implied and direct threats of physical harm sufficient to establish extreme and outrageous conduct); *Milton* v. *Illinois Bell Tel. Co.*, 427 N.E.2d 829, 832, 101 Ill. App. 3d 75, 56 Ill. Dec. 497 (Ill. App. Ct. 1981) (employer's abuse of authority over an employee can qualify as extreme and outrageous conduct); *Pavilon* v. *Kaferly*, 561 N.E.2d 1245, 1251, 204 Ill. App. 3d 235, 149 Ill. Dec. 549 (Ill. App. Ct. 1990) (finding sexual harassment by employer to be extreme and outrageous); *Radimecky* v. *Mercy Health Care and Rehab. Ctr.*, 2000 WL 1644510, *6 (N.D. Ill. Oct. 26, 2000) (allegation of physical assault in connection with wrongful termination sufficient to survive motion to dismiss).

8.     Fraudulent Concealment Claim

In Count XII, plaintiff alleges that defendants concealed the contents of the letter the Firm sent to Perkins regarding Dalton's investigation of Perkins's complaint. Defendants

---

[9]Plaintiff does not direct anny allegations regarding intentional infliction of emotional distress towards Dalton. Accordingly, plaintiff's Count XI is dismissed as to Dalton.

contend that plaintiff fails to plead the claim with particularity as required by Rule 9(b), Fed. R. Civ. P..

Fraudulent concealment must be pled with particularity under Rule 9(b), see *Triple Canopy, Inc*. v. *Moore*, 2005 WL 1629768, at * 12 (N.D. Ill. Jul. 1, 2005), which means that plaintiff must plead the who, what, when and where of the alleged fraudulent concealment. *Beauchem* v. *Rockford Products Corp.*, 2003 WL 1562561, *3 (N.D. Ill. Mar. 24, 2003). Passive silence, however, is sufficient to trigger the fraudulent concealment doctrine where the defendants were in a continuing fiduciary relationship with the plaintiff. *Pitts* v. *Unarco Indus., Inc.*, 712 F.2d 276, 279 (7th Cir. 1983); *Clark* v. *Robert W. Baird Co., Inc.*, 142 F. Supp. 2d 1065, 1076 (N.D. Ill. 2001).

Since the court has sustained plaintiff's allegation that defendants owed her a fiduciary duty, she is not required to plead a false statement. The allegations comprising her fraudulent concealment claim, therefore, are sufficient, as she alleges the who, what, when and where of defendants' passive concealment. Specifically, plaintiff alleges that defendants, and more precisely Yelin, failed to disclose the contents of the Perkins letter during the course of her employment during the period between October 2002 and April 2003. These allegations are sufficient to state a cause of action for fraudulent concealment by a defendant who owes the plaintiff a fiduciary duty.[10]

---

[10]As defendants note, plaintiff's fraud allegations are not limited to concealment through passive silence, as she alleges affirmative false statements, "a pattern of fraudulent conduct", "a series of deceptive and misleading messages", a false affidavit, and "deception, subterfuge and other fraudulent conduct." These allegations are pled with insufficient particularity, as plaintiff fails to plead the identifying details of these alleged affirmative frauds. Accordingly, plaintiff's fraud claim insofar as it relates to alleged fraudulent conduct is dismissed with leave to re-plead with greater specificity.

Additionally, plaintiff does not allege that Dalton engaged in any fraudulent conduct. Thus,

(continued...)

**ORDER**

For the reasons set forth above, the court denies in part and grants in part defendants' motion to dismiss plaintiff's complaint [#15]. Defendants' motion to dismiss all claims against Dalton pursuant to 12(b)(2), Fed. R. Civ. P., for lack of jurisdiction is denied. Defendants' motion to dismiss pursuant to 12(b)(6) is granted as to prelimitations period, discrete, discriminatory acts; denied as to plaintiff's failure to promote claim; granted as to plaintiff's claims based on prelimitations period unequal pay and retaliation; granted as to plaintiff's hostile work environment claim based on an alleged discriminatory investigation; denied as to Counts 5, 6, 8 as to the Firm, 10, 11 as to the Firm and Yelin, and 12 as to the Firm and Yelin; granted as to Counts 7, 9, 11 as to Dalton, and 12 as to Dalton. Plaintiff is given 14 days from the date of this Order to amend count XII consistent with this court's instructions. Defendants are directed to answer plaintiff's amended complaint within 21 days after the date her amended complaint is filed. If plaintiff elects not to amend her complaint, defendants are directed to file their answer to plaintiff's complaint within 21 days from the date of the expiration of plaintiff's 14 days period to file an amended complaint. A scheduling conference is scheduled for September 20, 2007 at 9:30 a.m. The parties are directed to make the Rule 26(a)(1), Fed. R. Civ. P., disclosures in the meantime.

ENTER:_____

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: July 24, 2007

---

[10](...continued)
plaintiff's Count XII is dismissed as to Dalton.